IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR 14-01548-TUC-JAS (CRP) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Mauro E. Morales Loya, | |
| Defendant. | |

On September 17, 2014, Defendant Mauro E. Morales Loya was indicted for Possession with Intent to Distribute 50 Kilograms or More of Marijuana, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C) (Doc. 6) On January 20, 2015 Defendant filed a Motion to Suppress Evidence (Doc. 16) The Government filed its Response on March 17, 2015 (Doc. 26) and Defendant filed his Reply on March 24, 2015 (Doc. 27)

Pursuant to LRCrim. 5.1, this matter came before Magistrate Judge Pyle for an evidentiary hearing and a report and recommendation.  On March 25, 2015 a hearing was held by Magistrate Judge Pyle and the matter taken under advisement. (Doc. 29) The Magistrate Judge recommends that the District Court, after its independent review, GRANT Defendant's motion.

### FACTS

On August 18, 2014, Border Patrol Agent Salvador Rubalcava was conducting a roving patrol while parked on the side of State Route 90 (SR 90) observing northbound traffic near Mile Marker 301 in Southern Arizona. (Defendant's Motion, p. 2; Government's Response, p. 3) SR 90 is a stretch of highway connecting cities in Southern Arizona such as Bisbee and Naco to Interstate 10 east of Tucson, Arizona. (Doc. 36, p. 14) There is a fixed Border Patrol checkpoint located on SR 90 at approximately Mile Marker 304 in the northbound lane. (Doc. 36, p. 15) Apparently due to weather, the fixed checkpoint was closed on August 18, 2014. (Doc. 36, p. 18) Border

1

2

3   Patrol routinely conducts increased roving patrols when the checkpoint is closed. (*Id.*) At

4   approximately 9:20 p.m., Agent Rubalcava observed a white Dodge Intrepid pass his

5   location. (Doc. 36, p. 25) There are no street lights or artificial lighting fixtures on this

6   patch of highway, so Agent Rubalcava flashed his high beams into the cab of the vehicle.

7   (Doc. 36, p. 14) The vehicle was old with dark-tinted rear windows. (*Id.*) Agent

8   Rubalcava testified that he observed one occupant in the vehicle – the driver. (*Id.*) Agent

9   Rubalcava only caught a one-to-two-second glimpse into the vehicle as it passed, but he

10  was able to identify the driver as a male and took note of his "statue-like" seated position.

11  (Doc. 36, p. 32) The driver tapped his brakes as he passed the Agent. (Doc. 36, p. 31, 32)

12  Based on the awkward seated position of the driver, the tinted windows and age of the

13  car,  and the driver tapping his breaks, Agent Rubalcava decided to begin following the

14  vehicle. (Doc. 36, p. 32)

15       Agent Rubalcava pulled out onto SR 90, in the left-hand lane, and testified that he

16  had to push his marked Border Patrol Tahoe to maximum speed in order to catch up to

17  the Intrepid, stating "…I wasn't catching up as fast as I – usually do." (Doc. 36, p. 35)

18  When he did catch up to the vehicle, Agent Rubalcava pulled alongside, shined his light

19  into the cabin and noted that the driver was still seated awkwardly in the driver's seat,

20  close to the steering wheel. (Doc. 36, p. 41) He didn't see anything else in the three-to-

21  four-seconds he flashed his lights into the vehicle's cab. (Doc. 36, p. 43) Agent

22  Rubalcava then dropped back and began following the vehicle, at which time the driver

23  slowed down and began driving under the 65 miles per hour speed limit. (Doc. 36, p. 42)

24  The agent then called in the Intrepid's license plate number for a registration check. (Doc.

25  36, p. 42) Shortly after Agent Rubalcava fell back to follow the vehicle from behind, the

26  driver made two lane-changes: from the right lane into the left lane and then back into the

27  right lane from the left lane. (Doc. 36, p. 46) Agent Rubalcava testified that he believed

28  the vehicle would attempt an evasive maneuver when he changed lanes into the left lane

- 2 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

because there was an emergency turn-around in proximity. (Doc. 36, pp. 44-46) Behind the vehicle, Agent Rubalcava observed the vehicle pass over a "rough spot" on the highway at approximately Mile Marker 297. (Doc. 36, p. 51) The agent testified that, in his experience, the normal reaction of a vehicle passing over this spot in the road is "swaying from side to side and front to back" and then recovering. (Doc. 36, p. 51) He further testified that loaded vehicles passing over this patch of road "float on the road," bouncing a little longer before recovering. (*Id.*) Agent Rubalcava testified that he has observed loaded vehicles going over bumps in the road, both loaded with luggage or illicit cargo, and has experience identifying when a vehicle is loaded versus not loaded with extra weight. (Doc. 36, p. 35) While traveling four car lengths behind the Intrepid, Agent Rubalcava observed that the vehicle was "floating on the road" as it passed over the rough patch. (Doc. 36, p. 53) From this observation, he inferred that the vehicle was loaded with extra weight. (*Id.*) After passing over the rough patch, the agent testified that the vehicle weaved within its lane, never touching or crossing the designated lane boundaries. (Doc. 36, p. 54) The completed registration check revealed that the vehicle was registered to a man and a woman in Sierra Vista, Arizona. (Doc. 36, p. 55) Agent Rubalcava then initiated a vehicle stop near Mile Marker 296. (Doc. 36, p. 55; Government's Response, p. 4)

Agent Rubalcava approached the driver's side and saw the driver, later identified as defendant Mauro E. Morales Loya, moving into the passenger seat. (Doc. 36, p. 60) Agent Rubalcava instructed Defendant to return to the driver seat through the closed driver's side door. (*Id.*) After determining that the driver's side window wasn't operational, Agent Rubalcava opened the driver's side door with Defendant's permission. (Doc. 36, p. 61) The agent testified that he smelled perfume emanating from the vehicle. (Doc. 36, p. 62) Communicating in the Spanish language, Defendant immediately began talking to Agent Rubalcava, stating that he was driving to pick up his girlfriend "Judith"

- 3 -

1

2

3   in an area near the intersection of SR 90 and I-10. (Doc. 36, p. 64; Defendant's Motion,

4   p. 4; Government's Response, p. 5) Defendant indicated that the Intrepid belonged to his

5   girlfriend, but was unable to provide his girlfriend's last name when prompted by the

6   agent. (Doc. 36, p. 65) Defendant told Agent Rubalcava that he had picked up the

7   Intrepid from a Buffalo Wild Wings in Sierra Vista, Arizona and that his friend had given

8   him the car keys. (*Id.*) A black cell phone on the passenger seat rang repeatedly during

9   this interaction. (*Id.*) Defendant said his friend also gave him the cell phone. (*Id.*)

10  Believing Defendant's behavior and story to be suspect, Agent Rubalcava called for a K-

11  9 unit, the closest unit thirty minutes away near Tombstone, Arizona. (Doc. 36, p. 67)

12  Agent Rubalcava noted that Defendant was fidgety, excited and nervous and, for safety

13  reasons, asked Defendant if he would wait for the K-9 unit in the back of Agent

14  Rubalcava's Tahoe. (Doc. 36, p. 68) Defendant consented and waited in the back of

15  Agent Rubalcava's car unrestrained with the door open. (Doc. 36, pp. 68-69)

16      The K-9 unit arrived approximately 25-30 minutes later, at 9:55 PM. (Doc. 36, p.

17  69; Defendant's Motion, p. 5) Once the K-9 unit arrived, Agent Rubalcava briefly closed

18  his vehicle door, with Mr. Morales Loya still inside, and went to assist the other agent.

19  (Doc. 36, p. 69-70) The K-9 unit alerted to the trunk of the Intrepid and the agents opened

20  the trunk to find nine bundles of marijuana. (Doc. 36, p. 70-71) The agents discovered an

21  additional bundle behind the driver's seat, for a total of over 200 pounds of marijuana.

22  (Doc. 36, pp. 71, 72) Defendant was subsequently placed under arrest.

23                                  DISCUSSION

24      Defendant first argues that facts as articulated by Agent Rubalcava did not amount

25  to reasonable suspicion. (Doc. 16, p. 5) Accordingly, Defendant seeks suppression of all

26  evidence. Defendant further asserts that his seizure became an unlawful *de facto* arrest

27  when he was detained for longer that reasonably necessary to effectuate the purpose of

28  the stop. (Doc. 16, p. 8)

- 4 -

1

2    **THE *TERRY* STOP**

3

4        Defendant contests the investigatory stop of his vehicle as unsupported by

reasonable suspicion. (Doc. 16, p. 5)

5

6        "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

7    Government, and its protections extend to brief investigatory stops of persons or vehicles

that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002)

8

9    (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Cortez*, 449 U.S. 411, 417,

10   101 S.Ct. 690 (1981)). Law enforcement may conduct an investigatory stop of a vehicle

11   based upon reasonable suspicion that a suspect is engaging in criminal activity. *Terry v.*

12   *Ohio,* 392 U.S. 1, 21, (1968) (investigatory stop valid when law enforcement observed

13   defendants acting in manner consistent with defendants contemplating robbery); *United*

14   *States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *United States v.*

15   *Drake,* 543 F.3d 1080, 1088 (9th Cir.2008). Reasonable suspicion cannot be founded on

16   inarticulable hunches or general suspicions. *Ybarra v. Illinois,* 444 U.S. 85, 92–93, 100

17   S.Ct. 338, (1979) (no reasonable suspicion to detain unarmed patron despite warrant to

18   search tavern and generalized suspicion that drug transactions had occurred therein).

19   Investigatory stops are valid if reasonable suspicion objectively exists. *Arvizu,* 534 U.S.

20   266, 273 (court must determine if law enforcement had a "particularized and objective

21   basis" for reasonable suspicion); *United States v. Berber–Tinoco,* 510 F.3d 1083, 1088–

22   89 (9th Cir.2007) (valid vehicle stop based upon objective reasonable suspicion after

23   activation of seismic device, law enforcement soon thereafter saw vehicles in area known

24   for presence of undocumented aliens, vehicles traveled slowly, braked periodically, and

25   area was an alien pick-up staging site).

26       The "particularized and objective basis" is law enforcement's personal

27   observations and law enforcement's knowledge that a crime has been committed. *Illinois*

28

*v. Wardlow,* 528 U.S. 119, 124–25 (2000) (reasonable suspicion based upon law enforcement observation of unprovoked flight by suspect holding opaque bag); *United States v. Hensley,* 469 U.S. 221, 232–35 (1985) (reasonable suspicion to stop vehicle driven by suspected accomplice in robbery based upon an other law enforcement bulletin); *see also Drake,* 543 F.3d at 1088 (reasonable suspicion to stop when law enforcement observed speeding vehicle at night on road leading from recently robbed store, smelled burning fluid indicating vehicle driven quickly, and driver looked at officers in odd manner); *Berber–Tinoco,* 510 F.3d at 1088. In determining whether reasonable suspicion exists, a "totality of the circumstances" test is applied. *Arvizu,* 534 U .S. at 275–77; *see also Cortez,* 449 U.S. at 417.

Courts accord great deference to the observations and conclusions of law enforcement, reasoning that an officer, by experience and training, can infer criminal activity from conduct seemingly innocuous to a lay person. *Arvizu,* 534 U.S. at 277; *Berber–Tinoco,* 510 F.3d at 1088–89; *United States v. Camargo,* 208 F.3d 1122, 1131 (9th Cir.2000). Experience alone may not be used to give an officer unbridled discretion in making a stop. *Nicacio v. INS,* 797 F.2d 700, 705 (9th Cir.1986), *overruled in part on other grounds by Hodgers–Durgin v. De La Vina,* 199 F.3d 1037 (9th Cir.1999). The inferences that law enforcement draw based upon their training and experience "must also be grounded in objective facts and be capable of rational explanation." *United States v. Rojas–Millan,* 234 F.3d 464, 469 (9th Cir.2000). Inferences may not be drawn on isolated or *de minimus* instances of otherwise innocent conduct. *United States v. Manzo–Jurado,* 457 F.3d 928, 939–40 (9th Cir.2006) (no reasonable suspicion to stop existed based upon seeing a group of Hispanic men appearing to be at work and conversing in Spanish, then seeing defendant get into truck after he saw a Border Patrol vehicle, defendant's actions did not distinguish him from group which is similar to many lawful

immigrants); *see also United States v. Sigmond–Ballesteros,* 285 F.3d 1117, 1121 (9th Cir.2002) (law enforcement's generalizations, if accepted, cast suspicion on large segments or entire categories of the law-abiding population).

On the other hand, seemingly innocent actions may cumulatively create reasonable suspicion. *United States v. Sokolow,* 490 U.S. 1, 9, 109 S.Ct. 1581 (1989); *see also United States v. Johnson,* 581 F.3d 994, 1000 (9th Cir.2009) (valid investigatory stop and frisk based upon reasonable suspicion after observing two individuals entering bank, one putting sweatshirt hood up and whispering to the other, while a third individual stayed in vehicle). A generalized concern of criminal activity in an area and a person's presence there creates no reasonable suspicion. *Brown v. Texas,* 443 U.S. 47, 52 (1979) (no reasonable suspicion to stop a person based solely on that person's presence in an area known for drug activity).

"In the context of border patrol stops, the totality of the circumstances may include characteristics of the area, proximity to the border, usual patterns of traffic and time of day, previous alien or drug smuggling in the area, behavior of the driver, appearance or behavior of passengers, and the model and appearance of the vehicle." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (citing *Bignoni-Ponce*, 422 U.S. 873, 884-85). "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion[,] . . . [a]nd the facts must be filtered through the lens of the agents' training and experience." *Valdes-Vega*, 738 F.3d at 1079 (citations omitted).

As outlined below, the facts taken into consideration separately and in the "totality of the circumstances analysis" in this case demonstrate that Agent Rubalcava did not possess the requisite reasonable suspicion to stop Defendant.

1. Traveling on a Known Drug Smuggling Route and Closed Checkpoint

Agent Rubalcava testified that SR 90 was known as a highway commonly used by

1

2
drug and alien smugglers. (Doc. 36, p. 14). The agent had experience stopping smuggling

3
vehicles on that road. (Doc. 36, p. 15) Additionally, based upon experience and historical

4
knowledge, because the Border Patrol checkpoint on SR 90 was closed due to inclement

5
weather, Agent Rubalcava expected increased smuggling traffic on the highway. (Doc.

6
36, p. 13)

7
        Officers' suspicion or awareness that a particular location or route is used

8
predominantly for illegal purposes, including alien or drug smuggling, is strong support

9
for a finding of reasonable suspicion. *United States v. Manzo–Jurado,* 457 F.3d 928, 936

10
(9th Cir.2006), *see also Arvizu,* 534 U.S. at 269, 277 (finding it significant that officers

11
found the defendant on an unpaved road rarely traveled except for use by local ranchers

12
and forest service personnel, but commonly used by smugglers to avoid a nearby border

13
checkpoint). In contrast, a location or route frequented by illegal immigrants, but also by

14
many legal residents, is not significantly probative to an assessment of reasonable

15
suspicion. *See United States v. Sigmond–Ballesteros,* 285 F.3d 1117, 1124 (9th Cir.2002)

16
(reasoning that the defendant's location on a highway commonly used for alien

17
smuggling was of only "minimal significance" because the court presumed the great

18
majority of people who used the highway were lawfully present in this country). A

19
generalized concern of criminal activity in an area and a person's presence there creates

20
no reasonable suspicion. *Brown,* 443 U.S. 47, 52.

21

22
        State Route 90 breaks from State Route 80 in Southern Arizona near Bisbee. It

23
continues north and connects with Interstate I-10 east of Benson, Arizona. SR 90

24
connects major destinations such as Sierra Vista and Ft. Huachuca to Tucson. Closed

25
checkpoint or not, on any given day, the great majority of persons utilizing SR 90 are

26
using the highway for lawful purposes. In this Court's view, the fact that Defendant's

27
vehicle was traveling on a road commonly used for alien and drug smuggling, but also

28

- 8 -

1

2

3  commonly used by lawful citizens, only minimally supports reasonable suspicion in this

4  case.

2. Defendant's Posture

5

6          Evidence of suspicious or peculiar behavior by drivers of a vehicle may add to the

7  reasonableness of suspicion. Agent Rubalcava testified that Defendant's posture while

8  driving was statue-like, indicating that he was nervous. (Doc. 36, pp. 32, 41) The agent

9  also determined that Defendant, a male, was unusually close to the steering wheel, similar

10 to the position a female would be in while driving. (Doc. 36, p. 77) Agent Rubalcava

11 opined that it is uncommon for males to sit so close to the steering wheel. (Doc. 36, p. 77)

12 Agent Rubalcava surmised that this position meant both that the driver was nervous and

13 that there may be contraband behind the seat, causing Defendant to sit closer to the

14 steering wheel. (Doc. 36, p. 32) The behavior of the Defendant factors appropriately into

15 the determination of reasonable suspicion. *See, e.g., Arvizu,* 534 U.S. at 277

16 (Investigative traffic stop was justified where the driver assumed a rigid posture, the

17 passengers behaved oddly, and the vehicle was traveling at shift-change time with excess

18 cargo through an area frequented by smugglers.)

19          Here, Agent Rubalcava testified that while he could determine that the driver of

20 the Intrepid was male when the vehicle first passed him, he could not ascertain the

21 driver's height or age and could not guess as to his driving habits. (Doc. 36, p. 78) While

22 Defendant remained in the awkward position when Agent Rubalcava pulled up alongside

23 the vehicle to get a better look inside, the agent could not see into the backseat to

24 determine if there was something or someone in the back seat or on the floor. (Doc. 36, p.

25 41) In this case, the Defendant's posture weighs in favor of the government. But absent

26 other articulable factors, the Defendant's awkward seating position cannot alone supply

27 reasonable suspicion.

28

1

2

3. Lane-Change, Speed and Weaving of Defendant's Vehicle

3

4             Driving behavior can also be considered as a factor in the reasonable suspicion

5       analysis. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 885 (1975). Here, Agent

6       Rubalcava testified Defendant initially increased his speed, making it difficult for Agent

7       Rubalcava to catch up to him, and then later reduced his speed to below the speed limit

8       when the agent caught up to his vehicle. (Doc. 36, pp. 35, 42, 46-47). Agent Rubalcava

9       testified that Defendant changed lanes twice, leading him to believe that Defendant was

10      going to try to escape. (Doc. 36, p. 44-46) Defendant was also observed weaving within

11      the lane. (Doc. 36, p. 54). In Agent Rubalcava's opinion, this indicated Defendant was

12      nervous and paying special attention to the agent. (*Id.*). Agent Rubalcava also testified,

13      however, that although the speed limit on SR 90 is 65 miles per hour, average traffic

14      travels at approximately 60 miles per hour. (Doc. 36, p. 24)

15             The law of this circuit teaches that the presence of such facts as driver

16      preoccupation, slow speed, movement within one's own lane of traffic do not give rise to

17      legally sufficient reasonable suspicion. For instance, a driver's preoccupation with a

18      police vehicle following him is a "quite natural reaction" and was held to be insufficient

19      to justify an investigatory stop. *United States v. Robert L.,* 874 F.2d 701, 703 (9th

20      Cir.1989). The slow speed of the vehicle, the driver's preoccupation, and the driver's

21      residence in a neighborhood under investigation for narcotics activity did not support a

22      finding of "reasonable suspicion." *United States v. Hernandez–Alvarado,* 891 F.2d 1414,

23      1418 (9th Cir. 1989). In another case, the Ninth Circuit determined once again that the

24      type of vehicle, the driver's preoccupation and the highway's reputation as a route for

25      smuggling were inadequate to give rise to "reasonable suspicion" that would have

26      allowed a proper stop. *United States v. Garcia–Camacho,* 53 F.3d 244, 249 (9th Cir.

27      1995). The Ninth Circuit also frowned on speed of the vehicle as a basis for reasonable

28

1

2

3      suspicion in *Garcia–Camacho,* pointing out that the government has argued both

4      increases and decreases in speed constitute "suspicious" conduct, creating a "heads I win,

5      tails you lose" trap for drivers who do not maintain constant speed. *Id.,* 53 F.3d at 247.

6              In the view of this Court, Agent Rubalcava's testimony that Defendant increased

7      his speed after passing the agent's position is unpersuasive because the agent does not

8      carry a radar speed detector and cannot estimate how fast Defendant was driving when he

9      passed him. The agent did not see the car speed up as it passed by and did not include his

10     own speed in attempting to catch up to the Intrepid in his report. (Doc. 36, p. 82)

11     Additionally, the fact that Defendant reduced his speed when Agent Rubalcava caught up

12     to him is indicative of a natural reaction to the presence of a law enforcement vehicle.

13     Indeed, on cross-examination, Agent Rubalcava testified that upon seeing law

14     enforcement, it is reasonable for a driver to decelerate slightly. (Doc. 36, p. 81)

15     Testimony regarding Defendant's changing lanes in an attempt to escape and weaving

16     within the lane because he was paying attention to Agent Rubalcava was not convincing

17     as Agent Rubalcava testified Defendant's vehicle never left its lane and Defendant did not

18     attempt to escape, but pulled over without incident. These facts provide little heft to the

19     government's case.

20     4. Defendant's Vehicle Being Old and its Tinted Rear Windows

21             The fact that the vehicle has characteristics common to those known to be

22     employed in smuggling aliens and drugs is certainly relevant for the reasonable suspicion

23     inquiry. *See Brignoni–Ponce,* 422 U.S. at 885. On direct examination, Agent Rubalcava

24     testified that in his experience, drug and alien smugglers prefer to use vehicles in poor

25     condition that do not cost much to replace. (Doc. 36, p. 26-27). Since Defendant's vehicle

26     was an older vehicle, Agent Rubalcava indicated this was one of the factors that formed

27     his reasonable suspicion that Defendant was involved in criminal activity. Moreover,

28

1

2      Agent Rubalcava testified that while the front windows were lightly or not-at-all tinted,

3      the rear windows of the Intrepid were darkly tinted. In Agent Rubalcava's experience,

4      smugglers tint the windows in this fashion in order to conceal the contents of the back

5      seat. (Doc. 36, p. 27) However, Agent Rubalcava conceded that many vehicles in

6      Southern Arizona have tinted windows. (Doc. 36, p. 28) While relevant under the totality

7      of the circumstances, these factors garner little suspicion.

8      5. Prolonged Bounce or Sluggish Suspension of Defendant's Car

9

10            Agent Rubalcava testified that Defendant's car "floated" over the rough patch on

11      SR 90. (Doc. 36, p. 53) From this observation, he inferred that the vehicle was heavily

12      laden with cargo of some sort. (*Id.*) Again, vehicle characteristics that are common to

13      those known to be employed in smuggling aliens and drugs is certainly relevant for the

14      reasonable suspicion inquiry. *See Brignoni–Ponce,* 422 U.S. at 885. However, as the

15      Ninth Circuit has eloquently stated, "The vacationer whose car is weighted down with

16      luggage will find no comfort in these decisions; nor will the many law-abiding citizens

17      who drive older vehicles that ride low because their suspension systems are old or in

18      disrepair." *Id.* at 889-90.

19            Agent Rubalcava testified on cross-examination that the car was not "riding low"

20      and that the ride height appeared to be normal. (Doc. 36, pp. 90-91) He also agreed that,

21      in his experience, some of the cars he stopped that "floated" over bumps were holding

22      extra cargo in the form of luggage, not contraband. (Doc. 36, p. 93) He acknowledged

23      that he is not a mechanic and conceded that all makes and models of vehicles exhibit a

24      slightly different response to a bump or rough patch in the roadway. (Doc. 36, p. 94)

25      Defendant's expert witness, Gary Gyuro, a mechanic, testified that the condition of the

26      vehicle was normal for its age and that a failed rear strut could have caused extra

27      bouncing of the vehicle's tires when passing over bumps but that he would not expect

28

- 12 -

there to any pronounced abnormal bouncing in the body of the car when passing over the rough patch on SR 90. (Doc. 36, p. 120, 125) According to Mr. Gyuro, in order for the type of bouncing described by the agent to occur, the car would have to be laden with an additional eight-hundred to one-thousand pounds of weight. (Doc. 36, p. 127) In fact, in Mr. Gyuro's expert opinion, a vehicle excessively bouncing over rough road is not indicative of extra weight. (Doc. 36, p. 128) That Defendant's car appeared to recover more slowly after passing over a rough spot on SR 90 generates minimal suspicion in this case.

Together, the evidence proffered by the government provides insufficient suspicion. Rather, the facts known to the agents at the time of the stop portray an unremarkable situation: (1) This stop occurred on a busy highway in Sothern Arizona frequented by thousands of lawful travelers each year, not on a back road or indirect route; (2) Defendant was seated close to the steering wheel but exhibited no other suspicious behavior or driving maneuvers; (3) the agent did not point to a single traffic infraction committed by the driver; (4) the vehicle, while old with tinted windows, was properly registered and otherwise completely innocuous; (5) the vehicle suspension system was consistent with the age of the vehicle and the agent conceded that it could have been burdened with luggage as easily as contraband. As a whole, Agent Rubalcava's generalized observations cast suspicion on a large segment of the law-abiding population. In totality, the claimed suspicious circumstances articulated by the agent construct the very slenderest of reeds on which to lean his suspicion.

**THE *DE FACTO* ARREST**

Defendant next asserts that he was detained, without valid consent, for an unreasonable amount of time while waiting for a K-9 unit to arrive and that the stop was converted into an unlawful arrest. (Doc. 16, p. 8)

- 13 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The totality of the circumstances determines whether and when an investigatory stop becomes an arrest. *See Washington v. Lambert,* 98 F.3d 1181, 1185 (9th Cir.1996). In looking at the totality of the circumstances, the court examines two main components of the detention. *See Id.* First is "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted." *Id.* Under this component, the court should "review the situation from the perspective of the person seized," assessing whether "a reasonable innocent person in these circumstances would ... have felt free to leave after brief questioning." *United States v. Delgadillo–Velasquez,* 856 F.2d 1292, 1295–96 (9th Cir.1988). Second is "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Lambert,* 98 F.3d at 1185. This "inquiry is undertaken ... from the perspective of law enforcement," while bearing in mind that "the purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence." *United States v. Guzman–Padilla,* 573 F.3d 865, 884 (9th Cir.2009) (internal quotation marks and alteration omitted). "The second inquiry frequently proves determinative." *Id.*

After briefing on the instant motion was completed, the United States Supreme Court announced its decision in *Rodriguez v. United States,* 2015 WL 1780927, 575 U.S. —— (April 21, 2015), which further details the lawful scope of a traffic stop. The *Rodriguez* Court held that "the tolerable duration of police inquiries in the traffic—stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id.* (internal citations omitted.) Thus, "[a]n officer ... may conduct certain unrelated checks during an otherwise lawful traffic stop. But ... he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* Accordingly, the *Rodriguez* Court held that prolonging a traffic stop for seven minutes beyond the time required to address the traffic violation for the purpose of performing a drug dog sniff

- 14 -

1

2    violated the Fourth Amendment's shield against unreasonable seizures when the officers

3    lacked reasonable suspicion or consent to prolong the seizure. *Id.*

4         Here, Defendant was placed in the rear of Agent Rubalcava's marked Border

5    Patrol vehicle for 30 minutes waiting for the K-9 unit to arrive. Because this Court finds

6    that there was not reasonable suspicion sufficient to conduct an investigatory stop in this

7    matter, the Court must also find that the Defendant's detention, however temporary,

8    while awaiting the K-9 unit constituted an unreasonable seizure in light of current case

9    law.

10                              ### RECOMMENDATION

11        The Magistrate Judge recommends the District Court, after independent review,

12   GRANT Defendant's Motion to Dismiss or Suppress (Doc. 16). In the alternative, and

13   because parties were unable to fully brief prior to the Supreme Court's decision in

14   *Rodriguez*, should the District Court reject the Magistrate Judge's determination on

15   reasonable suspicion, the Magistrate Judge recommends allowing the parties additional

16   time to address the *de facto* arrest argument.

17        Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and

18   file written objections within fourteen days of being served with a copy of the Report and

19   Recommendation. If objections are not timely filed, they may be deemed waived. The

20   parties are advised that any objections filed are to be identified with the following case

21   number: **CR14-01548-TUC-JAS**.

22        Dated this 24th day of April, 2015.

23

24

25   _____

26   **CHARLES R. PYLE**
     **UNITED STATES MAGISTRATE JUDGE**
27

28
                                   - 15 -